**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION**

SCOTT BECKER,

               Plaintiff,

vs.

LINN COUNTY, IOWA; and
LINN COUNTY SHERIFF,

               Defendants.

No. 20-CV-23-CJW-MAR

**MEMORANDUM OPINION &
ORDER**

———————————

**TABLE OF CONTENTS**

I.     FACTUAL BACKGROUND ............................................................... 3

II.    SUMMARY JUDGMENT STANDARD ............................................13

III.   DISCUSSION..................................................................................15

       A.    Plaintiff's Partial Motion for Summary Judgment...........................16

       B.    Defendants' Motion for Summary Judgment ..................................18

             1.    ICRA Failure to Accommodate ......................................19

                  a.    Reassignment.....................................................21

                  b.    Harassment-Free Workplace ...................................22

             2.    ICRA Gender-Based Harassment ......................................23

                  a.    Statute of Limitations & Continuing Violations .............25

b.     Defendants' Substantive Arguments............................28

     i.     Severe or Pervasive.....................................28

     ii.     Defendants' Response to Harassment.................31

3.     ICRA Retaliation for Complaining of Gender-Based Harassment.................................................................32

a.     Motivating Factor ................................................35

b.     Legitimate Nondiscriminatory Reason ........................36

4.     FMLA Discrimination and Retaliation ...............................38

a.     Monetary Damages................................................43

b.     FMLA Discrimination Based on Harassment.................44

c.     FMLA Retaliation ................................................48

IV.     CONCLUSION ..............................................................................49

This matter is before the Court on the parties' cross-motions for summary judgment. On August 30, 2021, plaintiff filed a partial motion for summary judgment. (Doc. 32). Defendants timely filed their resistance. (Doc. 38). Plaintiff did not file a reply.[1] Also on August 30, 2021, defendants filed a motion for summary judgment. (Doc. 33). Plaintiff timely filed his resistance. (Doc. 42). Defendants timely filed their reply. (Doc. 51). Plaintiff filed a sur-reply brief in resistance to defendants' motion for summary judgment. (Doc. 54).

For the following reasons, plaintiff's partial motion for summary judgment is **granted** and defendants' motion for summary judgment is **granted in part** and **denied in part**.

## I.     *FACTUAL BACKGROUND*

The following facts are undisputed unless otherwise noted.[2]

Plaintiff Scott Becker worked as a Sheriff's Deputy in the Linn County Jail from 2011, to April 27, 2020. (Docs. 33-1, at 1, 12; 42-1, at 1, 27). Central to the parties' dispute are the questions of what motivated plaintiff's alleged harassment (*see* Docs. 42-2, at 7; 49, at 11), and why plaintiff was fired. (*See* Docs. 33-1, at 11; 42-1, at 24). Plaintiff alleges that his firing stems from his request and subsequent taking of Family

---

[1] Because plaintiff did not file a reply to defendants' resistance to plaintiff's motion for partial summary judgment as required by Local Rule 56(d), the Court construes plaintiff's failure to reply as an admission of defendants' statement of additional material facts in their resistance (Doc. 38-2), if not otherwise disputed in the record.

[2] Where facts are disputed, the Court interprets them in the light most favorable to the nonmoving party, as the summary judgment standard requires. *Tolan v. Cotton*, 572 U.S. 650, 651 (2014). In determining whether parties have met their initial burden in a motion for summary judgment, the Court will assess their arguments based on the undisputed facts. *See Hartnagel*, 953 F.2d at 395. In some instances, defendants have expressed that the facts are undisputed only for the purposes of summary judgment. (*See generally* Doc. 49). The Court has not noted the distinction herein when reciting the facts.

3

Medical Leave Act ("FMLA") leave around the birth of his second child in 2018. (Doc. 15, at 2, 6–7). On February 12, 2018, plaintiff submitted an FMLA request for two weeks when his son was born and eight weeks from July 1, 2018, to September 1, 2018. (Docs. 33-1, at 1; 42-1, at 1). His request was granted the next day. (Docs. 33-1, at 1; 42-1, at 1–2). Plaintiff admits that he knew his fellow deputies might be upset about working extra hours to cover plaintiff's leave.[3] (Docs. 33-1, at 2; 42-1, at 2). Plaintiff had been criticized by his fellow deputies at least twice before for his use of sick time. (Docs. 33-1, at 2; 42-1, at 2).

Plaintiff alleges that his fellow deputies and supervisors began harassing him for requesting and taking FMLA leave. On or before February 2, 2018, plaintiff had toilet paper and women's hygiene products put on and in his locker. (Docs. 33-1, at 2; 42-1, at 2–3). He emailed Lieutenant Kent Steenblock about this and also stated that he had received multiple emails stating that he "should feel guilty." (Docs. 33-1, at 2; 42-1, at 3). Around this time, deputies told plaintiff that his use of FMLA was "a dick move" and that plaintiff was "fucking [his fellow deputies] over," and called plaintiff selfish. (Docs. 42-2, at 1; 49, at 2). In his email to Lieutenant Steenblock, plaintiff described the behavior as harassment. (Docs. 33-1, at 2; 42-1, at 2–3). Lieutenant Steenblock spoke to plaintiff and to Jail Commander Major Pete Wilson about the situation. (Docs. 33-1, at 2; 42-1, at 3). Neither Lieutenant Steenblock nor Major Wilson acted to stop the harassment. (Docs. 42-2, at 17; 49, at 30).

Around this time, deputies formed an "isolation agreement" regarding plaintiff and shunned him (Docs. 42-2, at 3; 49, at 3–4), even though deputies rely heavily on each other, particularly when dealing with inmates who can be dangerous and occasionally armed. (Docs. 42-2, at 17–18; 49, at 31). One deputy told plaintiff that he

---

[3] The parties dispute, however, whether deputies actually used an unusual amount of overtime during plaintiff's absence. (Docs. 42-2, at 7; 49, at 12).

recognized this behavior was related to "taking time off with your kid." (Docs. 42-2, at 3; 49, at 4). Another deputy told plaintiff he was "better than" taking FMLA leave and "should have some regard for [his] coworkers." (*See* Docs. 42-2, at 2; 49, at 3).

Plaintiff's alleged harassment continued during his FMLA leave. During his second period of FMLA leave in August 2018, Lieutenant Matt Pavelka asked plaintiff whether he got fired[4] and after plaintiff responded that he did not, Lieutenant Pavelka replied that he should have. (Docs. 33-1, at 3; 42-1, at 6). This exchange occurred in front of multiple sergeants and other staff. (Docs. 42-2, at 3; 49, at 5). While plaintiff was out, his coworkers stopped texting him and inviting him to socialize outside of work. (Docs. 33-1, at 3; 42-1, at 6).

Comments from plaintiff's fellow deputies persisted when plaintiff returned from leave in September 2018. (Docs. 33-1, at 4; 42-1, at 7). One deputy said he was not allowed to talk to plaintiff. (Docs. 33-1, at 3; 42-1, at 5–6). In September or October 2018, Sergeant Casey Meyer, plaintiff's direct supervisor, said he could not tell plaintiff what he thought of his use of FMLA because if he did, he would "get fired." (Docs. 42-2, at 2–3; 49, at 4). Around the same time, a deputy turned "FMLA" into a derisive nickname for plaintiff. (Docs. 42-2, at 4; 49, at 6).

On September 25, 2018, plaintiff emailed Major Wilson, writing, "my property has disappeared again from the 3rd floor breakroom. There is a list of harassment that continues to grow. I would like those harassment issues to stop." (Docs. 33-1, at 4; 42-1, at 7). Plaintiff also reiterated his commitment to Linn County before stating, "However; many staff members have expressed their dislike in many forms of me employing my right to FMLA under the Linn County gu[i]delines. I am trying to handle

---

[4] The record contains inconsistencies about this incident. In some, the question was whether plaintiff got fired. (Docs. 33-1, at 3; 42-1, at 6). Elsewhere, it was whether he quit. (Doc. 34-1, at 23–24). This discrepancy, however, does not impact the Court's analysis.

this in a professional manner." (Docs. 33-1, at 4; 42-1, at 7). Major Wilson neither responded to plaintiff nor took action to stop the harassment. (*See* Docs. 33-1, at 4; 42-1, at 7).

Plaintiff's alleged harassment persisted into the following year. Deputies called plaintiff a "blue falcon," a military euphemism for "buddy fucker"—a person who "will screw over his friends for his own benefit"—and put blue falcon stickers on his locker.[5] (Docs. 42-4, at 4; 49, at 6). In April 2019, when walking out of the jail with two deputies, one deputy turned to plaintiff and said, "[d]on't talk to me, you piece of shit." (Docs. 42-2, at 4; 49, at 6–7). In May 2019, plaintiff mentioned to a fellow deputy that he might bid for a patrol position. (Docs. 42-2, at 4; 49, at 7). The deputy responded that patrol "wouldn't let [him]" because plaintiff had taken FMLA. (Docs. 42-2, at 4; 49, at 7). Also in May, plaintiff was in the breakfast breakroom with five or six deputies and Sergeant Erich Lear when someone made a joke about plaintiff's use of FMLA. ((Docs. 42-2, at 4; 49, at 7). Deputy Walton yelled, "I don't care if my wife is fucking bleeding out on the table, I wouldn't take FMLA." (Docs. 42-2, at 4; 49, at 7). According to at least two of plaintiff's fellow deputies, plaintiff's work situation had become "toxic" and "pretty severe." (Docs. 42-2, at 5; 49, at 7–8).

On June 26, 2019, plaintiff complained to the County's human resources department about the foregoing events. (Docs. 33-1, at 4; 42-1, at 8). He complained that he was being harassed because of use of FMLA and his sex. (Docs. 42-2, at 5; 49, at 8).

On July 17th, Sheriff Gardner emailed the staff and said that a complaint had been made and interviews would be conducted. (Docs. 33-1, at 5; 42-1, at 9). He also circulated the County's new Workplace Harassment Policy. (42-2, at 8; 49, at 12). The

---

[5] The record is unclear when this behavior began, but the context suggests it was sometime between the end of 2018 and the beginning of 2019. (Docs. 42-4, at 4; 49, at 6).

County hired an outside investigator, Douglas Duckett, to investigate plaintiff's complaint and related issues in the jail. (Docs. 33-1, at 5; 42-1, at 9). Sheriff Gardner was worried that plaintiff's coworkers might retaliate against him, so Duckett warned every interviewee that the Sheriff would "come down like a ton of bricks" if he learned deputies were "freezing [plaintiff] out or not helping him" like they would other deputies. (Doc. 42-2, at 11; 49, at 19).

Then, on August 20, 2019, plaintiff filed a discrimination and retaliation complaint with the Iowa Civil Rights Commission, alleging that "some form of harassment continues every day, including isolation, lack of assistance, and/or hurtful comments." (Doc. 42-2, at 11; 49, at 19)."

On August 27, 2019, Duckett and Director Powell interviewed plaintiff, who gave examples of harassment and reported racist and sexist language used at the jail. (Docs. 42-2, at 5, 12; 49, at 8, 19–20). For instance, plaintiff complained that several deputies and a sergeant discussed whether "another deputy would have anal sex with his father-in-law while his wife watched for 40 million dollars," and that a fellow deputy asked plaintiff whether gay men's testicles hurt while engaging in anal sex, implying plaintiff would know from personal experience. (Docs. 42-2, at 12; 49, at 20). The parties disagree about whether defendants replied appropriately, "com[ing] down like a ton of bricks" as Duckett warned. (Doc. 42-2, at 12; 49, at 19). Defendants assert that this event was not an example of continuing harassment because it occurred on July 8, 2019, and thus took place before Duckett's investigation. (Doc. 49, at 20). Plaintiff, however, asserts that defendants had a duty to respond because he informed defendants of the harassment during his interview. (Doc. 42-2, at 12).

When Duckett's investigation concluded, he found that at least most of plaintiff's allegations of harassment were true and that jail staff regularly used racist and sexist language. (Docs. 42-2, at 5, 8; 49, at 8, 13–14). Duckett also found that "with some

frequency," male deputies at the jail gave each other "peter taps" or "nut punches," either "mock cupping" or "back-hand slapping" the other's crotch area. (Docs. 42-2, at 5; 49, at 8–9).

Duckett also found plaintiff's two written complaints were "pleas for help." (Docs. 42-2, at 4; 49, at 6). He concluded that plaintiff was the subject of "inappropriate comments and actions because he chose to take FMLA leave following the birth of his son." (Docs. 33-1, at 5; 42-1, at 10). Duckett noted that some employees did not respect plaintiff's FMLA use "because they don't see that as something that a man does." (Docs. 33-1, at 6; 42-1, at 10–11).

Duckett concluded that some of plaintiff's coworkers had less respect for men taking leave to care for a baby than they would for women, even though deputies have to cover time for a woman just as they would for a man. (Docs. 42-2, at 6; 49, at 9). He found that plaintiff's gender was a motivating factor in his harassment. (Docs. 42-2, at 6; 49, at 9–10). None of the female deputies who had used FMLA to care for their newborns were harassed, isolated, or otherwise retaliated against. (Docs. 42-2, at 6; 49, at 10). Likewise, none of the deputies who used FMLA to recover from an injury were harassed, isolated, or otherwise retaliated against. (Docs. 42-2, at 7; 49, at 10–11). Indeed, some of plaintiff's coworkers agreed that he was treated unfairly because of FMLA. (Docs. 42-2, at 9; 49, at 14–15).

Nevertheless, Duckett also found that some employees "widely resented" plaintiff because they saw him as a "long-time abuser of sick leave" and believed that FMLA leave was paid leave, like sick leave. (Docs. 33-1, at 6; 42-1, at 10–11).[6] The parties

---

[6] Thus, these employees believed that plaintiff obtained two months of leave during the summer by requesting FMLA, while they were forced to work significant overtime. (Docs. 33-1, at 6; 42-1, at 10–11). Plaintiff, however, objects to the employee's interpretations as irrelevant because their rationale makes no difference to the legal determination of FMLA harassment. (Doc. 42-1, at 10–11). Duckett and Director Powell also investigated plaintiff's use of sick time

disagree as to the extent, if any, that plaintiff abused sick leave and whether abuse of sick leave might explain the coworkers' behavior. (Docs. 42-2, at 9–10; 49, at 15–16).

Duckett recommended discipline for several of plaintiff's coworkers. (Docs. 33-1, at 6; 42-1, at 12). For instance, Duckett recommended that Sergeant Meyer and Sergeant Lear be disciplined for failure to correct their deputies' behavior towards plaintiff, and that Lieutenant Steenblock and Major Wilson be disciplined for failing to respond appropriately to plaintiff's complaints. (Docs. 33-1, at 6; 42-1, at 12).

As plaintiff points out, however, defendants instituted more lenient discipline than recommended and even chose to forgo discipline entirely in some cases. For instance, Duckett recommended that defendants document Major Wilson's discipline, suspend him for two weeks, and institute a performance action plan. (Doc. 42-1, at 13–14). Instead, defendants took 40 hours from Major Wilson's paid time off. (Docs. 42-2, at 15; 49, at 26). Duckett also recommended that defendants take significant disciplinary action with Sergeant Lear and suspend him for 40 to 80 hours. (Doc. 42-1, at 13–14). Instead, defendants suspended Sergeant Lear for 24 hours. (*Id.*).

As a result of Duckett's investigation, Sheriff Gardner ordered all employees to undergo harassment training, including training focused on FMLA, and issued some discipline based on Duckett's report. (Docs. 33-1, at 7; 42-1, at 13–14). On September 25, 2019, Sheriff Gardner also sent out a detailed memorandum with clear directives about professional expectations. (*See* Docs. 33-1, at 7–8; 42-1, at 15).

Defendants claim that offensive conduct towards plaintiff then generally stopped. (Docs. 33-1, at 8; 49, at 23–24). Plaintiff, however, asserts that deputies who were upset

---

as an alternate explanation for the offending staff's behavior. (Docs. 42-2, at 9; 49, at 15). Defendants did not compare plaintiff's use of sick leave to that of other deputies. (Docs. 42-2, at 10–11; 49, at 17–18). In any event, the Court finds that plaintiff's use of sick time, however, is only relevant insofar as it aids the jury in assessing plaintiff's alleged harassment.

that plaintiff took FMLA leave became even more upset that he filed a complaint. (Doc. 42-2, at 13). Plaintiff further asserts that he continued to report ongoing isolation and that defendants did nothing to help. (Doc. 42-1, at 16).

After plaintiff attended the harassment training, Major Wilson gave plaintiff a sealed letter from Sheriff Gardner that ordered plaintiff to report to a disciplinary meeting to discuss plaintiff's violations of department policy following the investigation. (Docs. 42-2, at 14; 49, at 25). During the meeting, plaintiff told the Sheriff that he was still being harassed. (Docs. 42-2, at 14; 49, at 25). Other than this report, the parties dispute whether plaintiff continued to report ongoing harassment following the Duckett report. (Docs. 42-2, at 20; 49, at 35–36). For instance, plaintiff asserts that his fellow deputies tripped him as he pushed a cart, causing its contents to crash, and messed with him and his property in the locker room. (Docs. 42-2, at 20). Defendants admit that the events occurred but questions their motivation. (Doc. 49, at 27–28).

On November 18, 2019, Major Wilson informed plaintiff that his fellow deputies made three additional complaints against him, for (1) making derogatory or sexual comments about Deputy Walton's wife[7], though Deputy Walton used the terms himself, (2) tossing a milk carton at a fellow deputy, though deputies threw milk cartons to each other to give to inmates every morning, and 3) telling another deputy that an inmate needed to "blow," though the context was a breathalyzer test. (Docs. 42-2, at 15; 49, at 26–28). The deputies drafted the report because Major Wilson order them to do so. (Docs. 42-1, at 18–19; 49, at 27–28). Plaintiff received a counseling session and a recommended meeting with Sheriff Gardner for these infractions. (Doc. 51, at 10; 42-2, at 16; 49, at 29). The parties dispute whether this was a form of discipline. (Docs. 42-2, at 16; 49, at 29).

---

[7] Plaintiff's statement of additional material facts incorrectly used the name "Wilson." The Court believes the correct reference is to "Walton."

Also around this time, plaintiff was investigated after an inmate reported that plaintiff touched his foot in a sexual manner, but Lieutenant Steenblock determined this incident was unfounded. (Docs. 42-2, at 16; 49, at 28–29).

Frustrated, plaintiff broke down and realized he could not return to work anymore. (Docs. 42-2, at 15; 49, at 26–27). Plaintiff asserts his fellow deputies would have experienced the same demoralization at this lack of trust, (Doc. 42-2, at 18), but defendants deny that this is supported by the record. (Doc. 49, at 32–33).

Because plaintiff's circumstances had failed to improve, plaintiff began medical leave on November 19, 2019. (Docs. 33-1, at 9; 42-1, at 19). He was diagnosed with an anxiety disorder rooted in "work stress and harassment," and having had a panic attack at work. (Docs. 42-2, at 19–20; 49, at 34–35). The parties dispute the extent of plaintiff's mental illness. (Docs. 42-2, at 19; 49, at 34–35).

Plaintiff was originally scheduled to return to work on January 29, 2020. (Docs. 33-1, at 9; 42-1, at 19). Instead, he requested an accommodation of additional unpaid time off because he was not confident that the work environment had changed and feared retaliation. (Docs. 33-1, at 9; 42-1, at 20). On February 26, plaintiff requested additional leave, but could not get a doctor's note when Sheriff Gardner requested one. (Docs. 33-1, at 9–10; 42-1, at 20–21). Sheriff Gardner gave plaintiff until March 9 to provide documentation, but plaintiff's doctor declined to submit a note. (Docs. 33-1, at 10; 42-1, at 22). Reiterating the need for medical documentation, Sheriff Gardner proposed meeting with plaintiff to discuss other potential reasonable accommodations so plaintiff could return to work. (Docs. 33-1, at 10; 42-1, at 22).

On March 17, 2020, plaintiff spoke with Sheriff Gardner and Director Powell and told them his harassment had not stopped, but that he did not want to lose his job and asked to transfer to a courthouse deputy position. (Docs. 33-1, at 10–11; 42-1, at 22–23). Defendants assert that Sheriff Gardner had previously suggested a patrol position

11

and Director Powell later suggested a job working in juvenile detention as reasonable accommodations, but plaintiff denies that these accommodations were reasonable or, in the case of the juvenile position, that plaintiff would have been qualified. (Docs. 33-1, at 10–11; 42-1, at 22–23). Plaintiff asserts that Director Powell and Sheriff Gardner never investigated what job opening existed for which plaintiff was qualified. (Doc. 42-2, at 18). Defendants, however, state the record says otherwise. (Doc. 49, at 33–34). Regardless, plaintiff implies that no open position that could serve as a reasonable accommodation existed and suggests that Director Powell was deceitful in asserting that she was waiting on plaintiff to select a replacement position or provide a medical note in support of a finite period of additional unpaid leave. (Doc. 42-1, at 23).

On April 14, 2020, Sheriff Gardner sent plaintiff a letter setting an April 24 deadline for plaintiff to (1) provide another note for medical leave, or (2) suggest other accommodations. (Docs. 33-1, at 11; 42-1, at 24). Plaintiff responded the next day, that he would be willing to take a courthouse position, but remained unable to return to the jail because he would be "back in with [his] harassers." (Docs. 33-1, at 11; 42-1, at 24–25).

On April 17, 2020, Sheriff Gardner sent another letter stating that plaintiff must (1) return to work at the jail, or (2) provide another note for medical leave with anticipated duration. (Docs. 33-1, at 12; 42-1, at 26). The letter did not include any additional options or suggestions for accommodations. (*See* Docs. 33-1, at 12; 42-1, at 26). Plaintiff reiterated that he would be willing to take the courthouse position, but Sheriff Gardner clarified that there were no open positions in the courthouse and that plaintiff likely lacked the requisite seniority anyway. (Docs. 33-1, at 12; 42-1, at 26–27). Plaintiff did not respond further and did not return to work on April 24. (Docs. 33-1, at 12; 42-1, at 27).

On April 27, 2020, defendants fired plaintiff. (Docs. 33-1, at 12; 42-1, at 27).

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  When asserting that a fact is undisputed or is genuinely disputed, a party must support the assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Alternatively, a party may show that "the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1)(B).  More specifically, a "party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." FED. R. CIV. P. 56(c)(2).

A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted). "An issue of material fact is genuine if it has a real basis in the record," *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citation omitted), or "when a reasonable jury could return a verdict for the nonmoving party on the question," *Wood v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (internal quotation marks and citation omitted).  Evidence that presents only "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), or evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249–50, does not make an issue of fact genuine.  In sum, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" that it requires "a jury or judge to resolve the parties' differing versions of the truth at trial." *Id*. at 249 (citation and internal quotation marks omitted).

13

The party moving for summary judgment bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citation omitted). Once the moving party has met this burden, the nonmoving party must go beyond the pleadings and by depositions, affidavits, or other evidence designate specific facts showing that there is a genuine issue for trial. *See Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005).

If the *moving* party will bear the burden of persuasion at trial, then that party must support its motion with credible evidence, using any of the materials specified in Rule 56(c), "that would entitle it to a directed verdict if not controverted at trial." *Firemen's Fund Ins. Co. v. Thien*, 8 F.3d 1307, 1310 (1993). If the moving party makes this showing, then the nonmoving party has the burden of production to produce evidentiary materials that demonstrate the existence of a "genuine issue" for trial or to submit an affidavit requesting additional time for discovery. *Id.*

If the burden of persuasion at trial would be on the *nonmoving* party, then the party moving for summary judgment may satisfy Rule 56's burden of production in two ways, either by submitting affirmative evidence negating an essential element of the claim, or by demonstrating to the Court that the nonmoving party's evidence is insufficient to establish an essential element of their claim. *Bedford v. Doe*, 880 F.3d 993, 996–97 (8th Cir. 2018). If the moving party seeks summary judgment on lack of evidence, then the moving party must affirmatively show the absence of evidence. *Hanson v. FDIC*, 13 F.3d 1247, 1253 (8th Cir. 1994). If the moving party does not satisfy this showing, however, then its motion for summary judgment must be denied, and the Court need not consider whether the nonmoving party has met its ultimate burden of persuasion. *Id.*

In determining whether a genuine issue of material fact exists, courts must view the evidence in the light most favorable to the nonmoving party, giving that party the benefit of all reasonable inferences that can be drawn from the facts. *Tolan v. Cotton*, 572 U.S. 650, 651 (2014); *Matsushita*, 475 U.S. at 587–88 (citation omitted); *see also Reed v. City of St. Charles*, 561 F.3d 788, 790 (8th Cir. 2009) (stating that in ruling on a motion for summary judgment, a court must view the facts "in a light most favorable to the non-moving party—as long as those facts are not so 'blatantly contradicted by the record . . . that no reasonable jury could believe' them") (alteration in original) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). A court does "not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004) (citation omitted). Rather, a "court's function is to determine whether a dispute about a material fact is genuine." *Quick v. Donaldson Co.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996). When considering a motion for summary judgment, the court "need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3). Where the litigants concurrently pursue summary judgment, each summary judgment motion must be evaluated independently to determine whether there exists a genuine dispute of material fact and whether the movant is entitled to judgment as a matter of law. *See, e.g., Wermager v. Cormorant Township Bd.*, 716 F.2d 1211, 1214 (8th Cir. 1983).

## III.    DISCUSSION

The Court will first consider plaintiff's partial motion for summary judgment on defendants' anticipated *Ellerth/Faragher* affirmative defense. (Doc. 32-1, at 1). Then the Court will consider defendants' motion for summary judgment. (Doc. 33). For the following reasons, the Court grants plaintiff's partial motion for summary judgment, and grants in part and denies in part defendants' motion for summary judgment.

## A. Plaintiff's Partial Motion for Summary Judgment

The Court grants plaintiff's partial motion for summary judgment because it is undisputed that the *Ellerth/Faragher* defense does not apply. The *Ellerth/Faragher* affirmative defense[8] applies when an employer is vicariously liable for harassment by supervisors. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775, 788–792 (1998)). To assert *Ellerth/Faragher*, the party must show that (1) "[it] exercised reasonable care to prevent and correct promptly any harassing behavior," and (2) "the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise." *Ellerth*, 524 U.S. at 765. The defense is unavailable when the harassment results in an adverse employment action, such as being fired. *Id.* at 765.

Plaintiff asserts he is entitled to partial summary judgment in his favor because defendants cannot assert the *Ellerth/Faragher* affirmative defense as pled in defendants' answer. (Doc. 32-1, at 2) (discussing Doc. 16) ("Affirmative defense number 6 claims 'Defendants took prompt remedial action upon being advised of Plaintiff's claims of harassment, and Plaintiff did not take advantage of the remedial measures Defendants provided.'"). Plaintiff argues that the *Ellerth/Faragher* defense is unavailable to defendants here because the harassment resulted in an adverse employment action, namely, plaintiff was fired, and defendants cannot show any facts supporting the defense because defendants concede that plaintiff followed proper procedure and concede they failed to take prompt remedial action to stop the harassing behavior against plaintiff. (*Id.*).

---

[8] The Supreme Court adopted the same holding in *Ellerth* and *Faragher*, two hostile work environment cases decided on the same day. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 764 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775, 788–792 (1998).

Defendants agree the *Ellerth/Faragher* defense does not apply, but disagree about why. (*See* Doc. 38). Defendants first note that the defense only applies where the plaintiff is harassed by a supervisor, such that the defendant can be vicariously liable for the supervisor's behavior. (*Id.*, at 2–5; *see also* Doc. 32-1, at 7). Thus, defendants argue that the defense cannot apply here because plaintiff alleges that he was harassed by his coworkers, not his supervisors. (*Id.*). Relatedly, defendants also argue they cannot be strictly liable for plaintiff's termination because plaintiff does not allege that he was terminated by a supervisor who harassed him. (*Id.*, at 6).

In sum, although the parties disagree as to why the *Ellerth/Faragher* defense does not apply, there is no dispute that the defense does not apply. (*See* Docs. 32-1, 38). In defendants' resistance and in their oral argument at the October 8, 2021 hearing in this case, defendants argue that plaintiff's motion is akin to seeking judgment as a matter of law on the affirmative element of plaintiff's harassment claim, namely whether defendants knew or should have known of the harassment and failed to take prompt and appropriate remedial action based on his complaints. (*Id.*, at 6–13). Thus, although defendants agree the *Ellerth/Faragher* defense does not apply, they argue the Court should not grant plaintiff's motion for partial summary judgment if it includes a finding that as a matter of law the defendants did not take prompt remedial action. (*Id.*). At oral argument, plaintiff asserted that his motion was not an attempt to shift his burden to establish this element of his harassment claim. In short, as the Court stated at the hearing, both parties and the Court agree that a grant of plaintiff's motion for partial summary judgment is not a judgment of law as to any affirmative element of plaintiff's harassment claim.

Thus, because it is undisputed that the *Ellerth/Faragher* defense does not apply, the Court grants plaintiff's partial motion for summary judgment.

## B.  Defendants' Motion for Summary Judgment

Plaintiff alleges defendants: (1) discriminated against plaintiff on the basis of sex in violation of the Iowa Civil Rights Act ("ICRA"); (2) subjected plaintiff to gender-based harassment in violation of the ICRA; (3) retaliated against plaintiff for complaining of gender-based harassment of the ICRA; (4) discriminated and retaliated against plaintiff in violation of the Family Medical Leave Act ("FMLA"); (5) discriminated against plaintiff based on his disability in violation of the ICRA; and (6) failed to provide him a reasonable accommodation in violation of the ICRA.[9]  (Docs. 28; 42, at 1).  Plaintiff does not object to the dismissal of his disability and sex discrimination claims.  (*See* Docs. 28, 42).  Thus, the Court grants defendants' motion for summary judgment on these claims.  Because plaintiff's remaining claims rely on different tests and standards, the Court will address each claim separately in the order plaintiff alleges them.  (*See* Doc. 42, at 1).  Ultimately, the Court finds plaintiff failed to show a genuine dispute of fact as to the failure to accommodate claim and grants defendants' motion.  Defendants, however, fail to meet their initial burden of showing that no genuine issue exists for trial regarding plaintiff's ICRA gender-based harassment claim, ICRA retaliation claim, and FMLA claims.  Thus, the Court denies defendants' motion as to these claims.

Defendants assert they are entitled to summary judgment in their favor on each of these remaining claims.  As the moving party in their motion for summary judgment, defendants must inform the Court of the basis for their motion and identify those portions of the record which show that no genuine issue exists for trial.  *Hartnagel*, 953 F.2d at 395 (citation omitted).  Once defendants meet their burden, plaintiff, as the nonmoving party, must then go beyond the pleadings and by depositions, affidavits, or other evidence

---

[9] The parties vacillate between referring to plaintiff's claim as "sex-based" or "gender-based." Plaintiff's claim does not turn on any distinction between the two terms.  Thus, the Court refers to plaintiff's claim using the language plaintiff uses: "gender-based harassment."

designate specific facts that show a genuine issue does indeed exist. Specifically, the nonmoving party—plaintiff—has the burden of persuasion to show eligibility. Thus, defendants may satisfy Rule 56's burden of production in two ways, either by submitting affirmative evidence negating an essential element of the claim, or by demonstrating to the Court that the nonmoving party's evidence is insufficient to establish an essential element of his claim. *Bedford*, 880 F.3d at 996–97. If defendants seek summary judgment on lack of evidence, then they must affirmatively show the absence of evidence. *Hanson*, 13 F.3d at 1253. The Court will assess whether the parties' meet their requisite burdens as it analyzes plaintiff's four claims.

### 1. *ICRA Failure to Accommodate*

The ICRA expressly states that an employer may not fire an employee because of his disability. IOWA CODE § 216.6(1)(a). Discrimination in a failure to accommodate action, therefore, is the failure to fulfill this affirmative duty. *Sieverding v. Humach, LLC,* 18-CV-1030-LTS, 2020 WL 966579, at *10–11 (N.D. Iowa Feb. 27, 2020). To prevail on a failure to accommodate claim, a plaintiff must show that: (1) the defendant knew about the plaintiff's disability; (2) the plaintiff requested a reasonable accommodation; (3) defendant failed to engage in a "flexible" and "informal" interactive process with plaintiff to determine possible accommodations; and (4) plaintiff's disability could have been reasonably accommodated. *Garrison v. Dolgencorp., LLC*, 939 F.3d 937, 941 (8th Cir. 2019) (internal quotation marks omitted).

In analyzing the parties' arguments, the Court will consider federal law, as Iowa courts do, to interpret the ICRA's Section 216.6(1)(a) protections. *See Rumsey v. Woodgrain Millwork, Inc.*, 962 N.W.2d 9, 21–22 (Iowa 2021); *DeBoom v. Raining Rose, Inc.*, 772 N.W.2d 1, 10 (Iowa 2009) ("Because the Iowa Civil Rights Act was modeled after Title VII of the United States Civil Rights Act, we turn to federal law for guidance in evaluating the Iowa Civil Rights Act."). Additionally, the Court will follow the

ICRA's guidance and construe the statute "broadly to effectuate its purposes." IOWA CODE § 216.18(1).

Defendants argue that plaintiff cannot prove that defendants failed to engage in a flexible and informal interactive process or that plaintiff's disability could have been reasonable accommodated. (*See* Doc. 34-1, at 14–17). Also, insofar as plaintiff requested an accommodation in the form of a harassment-free workplace, defendants argue that that accommodation is not reasonable, arguing that "[a] harassment-free workplace is not a reasonable accommodation" but is instead "a right for all employees regardless of disability status."). (Doc. 51, at 4). And even if it were an accommodation, defendants argue that plaintiff presents no evidence that he requested such an accommodation or that defendants failed to provide it. (*Id.*, at 4–6). Lastly, defendants argue that it is plaintiff's burden—not defendants'—to identify a "currently available vacant position the employee is qualified to perform." (*Id.*, at 6 (quoting *Rumsey*, 962 N.W.2d, at 23)). Defendants assert that plaintiff never did. (*Id.*).

Plaintiff argues that defendants' initial briefing failed to identify any specific portion of the record that demonstrates the absence of a genuine issue of material fact, (Doc. 41-1, at 11–12), and defendants failed to provide reasonable accommodations in the form of providing a harassment-free workplace or an alternative position for which plaintiff was qualified. (*Id.*, at 12–13). Regarding his second argument, plaintiff argued that a plaintiff need only make a facial showing that a reasonable accommodation exists before the employer must show it was unable to accommodate that request. (*Id.*, at 13). Finally, plaintiff argues that "a reasonable accommodation can be something the employer is already obligated to do under a different law." (Doc. 54, at 2). Plaintiff argues that, in fact, this pre-existing responsibility makes such an accommodation all the more reasonable. (*Id.*).

In sum, the Court must consider two potential accommodations: reassignment, and a harassment-free workplace. The Court takes these arguments in turn. For the following reasons, plaintiff failed to show a genuine dispute of fact that defendants failed to accommodate plaintiff by reassignment or providing a harassment-free workplace.

### a.    Reassignment

When an employee requests a disability accommodation by reassignment, he "must identify a specific available job [he] is qualified to perform." *Rumsey*, 962 N.W.2d, at 23; *Casey's General* Stores*, Inc. v. Blackford*, 661 N.W.2d 515, 521 (Iowa 2003). The parties dispute whether Director Powell or Sheriff Gardner investigated job openings or provided appropriate suggestions for plaintiff's reassignment. (*See* Docs. 33-1, at 10–11; 42-1, at 22–23). In fact, plaintiff implies that no open position that could serve as a reasonable accommodation existed (Doc. 42-1, at 23), and the undisputed facts show that plaintiff did not find a reasonable position for which plaintiff was qualified for reassignment. (Docs. 33-1, at 10–11; 42-1, at 22–23) (juvenile and patrol positions inappropriate); (Docs. 33-1, at 12; 42-1, at 26–27) (courthouse position inappropriate).

Plaintiff asserts that defendants had more information about openings in the Sheriff's Departments than plaintiff and should have made recommendations. (Doc. 41-1, at 12–13). Essentially, plaintiff asserts that placing this burden on the employee is unfair. The Court notes that any employee would likely assert that his employer has better insight into what jobs are available, given that the employer is the one hiring. Thus, plaintiff is not alone in this predicament. Nevertheless, it is a plaintiff's burden to do so and plaintiff has not carried that burden here.

Plaintiff's argument that the interactive process was insufficient because defendants were not more proactive and failed to alert plaintiff to positions for reassignment are unavailing. (*See* Docs. 41-1, at 12–13; 42-1, at 23; 42-2, at 18). Even if realistically the employer has more information on reassignment than plaintiffs, the law

is settled that the employee must present viable options for reassignment. *Rumsey*, 962 N.W.2d, at 23; *Casey's General Stores, Inc.*, 661 N.W.2d at 521. Plaintiff—not defendants—was therefore responsible for identifying possible positions for reassignment. Although plaintiff asserts that Director Powell was deceitful in asserting that she was waiting on plaintiff to select a replacement position or provide a medical note in support of a finite period of additional unpaid leave (Doc. 42-1, at 23), the law does not suggest Director Powell's alleged deception was unlawful, at least in the context of reassignment.

Thus, the Court finds that a reasonable juror could not find that defendants failed to engage in a "flexible" and "informal" interactive process with plaintiff to determine possible positions for reassignment. *See Treanor v. MCI Telecommunications Corp.*, 200 F.3d 570, 575 (8th Cir. 2000) (finding no question of fact regarding interactive process when plaintiff "made no assertion that any particular suitable job was available"). Defendants show that the law places the burden of finding available positions on plaintiff—not defendants. Plaintiff failed to show a genuine dispute of material fact as to whether defendants did not engage in the interactive process, because no reasonable juror would find that defendants failed to live up to their burden to show plaintiff available positions for reassignment when defendants do not have a burden to do so. Defendants' motion for summary judgment is granted as to this claim.

### b.    *Harassment-Free Workplace*

Plaintiff's failure-to-accommodate claim centered on the accommodation of a harassment-free workplace fails because the Eighth Circuit has found that reasonable accommodations do not extend to removing all conflict from the workplace. The Eighth Circuit wrote: "We do not believe . . . that the obligation to make reasonable accommodation extends to providing an aggravation-free environment." *Cannice v. Norwest Bank Iowa, N.A.,* 189 F.3d 723, 728 (8th Cir. 1999). Drawing from *Cannice*

22

and other cases, the District Court of Minnesota has found that even if a reasonable jury found that a plaintiff requested a harassment-free workplace, that reasonable jury could not find that the plaintiff requested a "reasonable accommodation" because no legal authority treats the elimination of harassment as a reasonable accommodation. *Schwarzkopf v. Brunswick Corp.*, 833 F. Supp. 2d 1106, 1123 (D. Minn. 2011). The Court agrees with the *Schwarzkopf* Court's reasoning and declines to extend a reasonable accommodation to include a harassment-free workplace.

Thus, even if the reasonable juror found that plaintiff asked for a harassment-free workplace, the reasonable juror could not find that he asked for a reasonable accommodation because the Eighth Circuit does not recognize a harassment-free workplace as a reasonable accommodation.

In sum, the Court grants defendants' motion for summary judgment on plaintiff's failure-to-accommodate claim.

### 2. *ICRA Gender-Based Harassment*

A plaintiff can recover under a direct negligence theory[10] of harassment if he shows: (1) "the employer knew or should have known of the harassment," and (2) "failed to take prompt and appropriate remedial action." *Haskenhoff*, 897 N.W.2d at 572. To establish a gender-based harassment claim, a plaintiff must show: (1) he "belongs to a

---

[10] Defendants note that plaintiff does not identify which negligence theory of harassment—direct or vicarious—he is claiming, but asserts that only direct negligence is applicable here because only Sheriff Gardner has punitive disciplinary powers and the ability to access personnel files, unlike other employees. (Doc. 34-1, at 22). Plaintiff does not address this comment in his resistance or sur-reply.

Plaintiff does, however, quote from 8th Circuit Jury Instruction 8.42, entitled "ELEMENTS OF CLAIM: HARASSMENT (By NonSupervisor)." (Doc. 45, at 24 (quoting EIGHTH CIRCUIT COURT OF APPEALS, MANUAL OF MODEL CIVIL JURY INSTRUCTIONS (2020), https://ecf.mowd.uscourts.gov/jmi/REV5.0CivilJuryInstructions-2021.pdf)). Because plaintiff relies on the "NonSupervisor" Jury Instruction and vicarious liability applies only to supervisors, the Court interprets plaintiff's claim as relying on the direct negligence theory of harassment.

protected group;" (2) he "was subjected to unwelcome harassment;" (3) "the harassment was based on a protected characteristic;" and (4) "the harassment affected a term, condition, or privilege of his employment." *Easterday v. Whirlpool Corp.*, 19-CV-20-LRR, 2020 WL 1536698, at *6 (N.D. Iowa Mar. 31, 2020) (quoting *Haskenhoff v. Homeland Energy Solutions, LLC*, 897 N.W.2d 553, 571 (Iowa 2017)).

Harassment affects a term, condition, or privilege of employment "when the workplace is permeated with discriminatory intimidation, ridicule, and insult . . . sufficiently *severe or pervasive* to alter the conditions of the victim's employment and create an abusive working environment." *Id.* (quoting *Haskenhoff*, 897 N.W.2d at 571) (internal quotation marks omitted and emphasis added). This "severe or pervasive" requirement forecloses recovery based on "merely offensive, immature or unprofessional" conduct. *Henthorn v. Capitol Comms., Inc,* 359 F.3d 1021, 1027 (8th Cir. 2004).

In the Title VII context, this objectively and subjectively offensive workplace is called an "abusive" or "hostile work environment." *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 20–21 (1993); *DeBoom*, 772 N.W.2d at 10 (noting Title VII standards as helpful guidance for evaluating ICRA). When considering whether an environment is "hostile or abusive," the court considers the totality of the circumstances, including the conduct's frequency and severity, whether it affects the employee's psychological well-being, whether it unreasonably interferes with or detracts from the employee's work performance, and whether the conduct discourages the employee from remaining on the job. *See Farmland Foods, Inc. v. Dubuque Human Rights Comm'n*, 672 N.W.2d 733, at 744–45 (Iowa 2003); *Harris*, 510 U.S. at 22.

Defendants argue that the "six to seven-month gap [in alleged incidents of harassment between September or October 2018 and April 2019] creates a statute of limitations issue." (*Id.*, at 24 n.5). This issue affects the evidence the Court may

consider when making its legal determination of whether the plaintiff's harassment was severe or pervasive. Thus, as a preliminary matter, the Court addresses defendants' statute of limitations argument.

### a. Statute of Limitations & Continuing Violations

The ICRA provides that a claim must be filed within 300 days of when the alleged discriminatory or unfair practice occurred. IOWA CODE § 216.15(13). But a court may consider acts outside the statutory limitations if those acts are part of a continuing violation. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 112–15 (2002). Continuing violations are "claims [that] are based on the cumulative effect of individual acts." *Id.*

A continuing violation can occur in two ways. First, the Court may consider acts outside the statute of limitations period if they "were so similar in nature, frequency, and severity that they must be considered to be part and parcel of the hostile work environment that constituted the unlawful employment practice that gave rise to this action." *Rowe v. Hussman Corp.*, 381 F.3d 775, 781 (8th Cir. 2004); *see also Hy-Vee Stores, Inc. V. Iowa Civil Rights Comm'n*, 453 N.W.2d 512, 528–29 (Iowa 1999) (describing a continuing violation via a "series of acts"). Second, an employer-maintained discriminatory policy or system can constitute a continuing violation. *Hy-Vee*, 453 N.W.2d, at 529. Whether plaintiff shows a discriminatory policy or series of acts, discrimination outside the limitations period will be considered so long as plaintiff complains of other acts falling within the statute of limitations period. *See id.* Simply put, if even one harassing act occurs within the limitations period, the employer is liable for the entirety of the hostile work environment. *Morgan*, 536 U.S. at 118–19.

Here, plaintiff filed a complaint with the Iowa Civil Rights Commission on August 20, 2019. (Doc. 42-2, at 11; 49, at 19). Absent application of the continuing violation doctrine, timely incidents would have occurred up to 300 days prior to the complaint, on

25

or after October 24, 2018. Plaintiff cites harassing incidents as early as February 2, 2018, when his locker was vandalized (Docs. 33-1, at 2; 42-1, at 2–3), and as late as November 18, 2019, when Major Wilson told three deputies to write up complaints about plaintiff on a single evening. (Docs. 42-2, at 15; 49, at 26–28). Although plaintiff does not expressly state which type of continuing violation he believes applies, his argument relies on an abusive or hostile work environment. (Doc. 45, at 24–32). Thus, the Court will analyze plaintiff's claim as asserting a continuing violation based on a hostile work environment.

For purposes of assessing which acts fall within the statute of limitations, the Court finds that the undisputed facts show an abusive or hostile work environment. The incidents occurring between February 2018 and November 2019 are sufficiently similar in nature, frequency, and severity that they are part and parcel of the same gender-based harassment of which plaintiff complains and are properly considered together with timely incidents on or after October 24, 2018, as part of defendants' continuing violation.

First, the undisputed facts show commonalities among plaintiff's harassing incidents, whether before or after October 2018-cutoff imposed by the statute of limitations. For instance, evidence both before and after October 2018 shows that supervisors did not take plaintiff's complaints seriously and in fact themselves harassed plaintiff. In spring 2018, plaintiff told his supervisor, Lieutenant Kent Steenblock, that his locker was covered in feminine hygiene products and toilet paper, and that deputies had emailed plaintiff telling him he "should feel guilty" for his FMLA use. (Docs. 33-1, at 2; 42-1, at 3). Plaintiff termed the behavior "harassment." (Docs. 33-1, at 2; 42-1, at 3). But, Lieutenant Steenblock and his supervisor, Major Wilson, failed to act. (Docs. 42-2, at 17; 49, at 30). After plaintiff returned from FMLA leave, Sergeant Casey Meyer, plaintiff's direct supervisor, said he could not tell plaintiff what he thought of his use of FMLA because if he did, he would "get fired." (Docs. 42-2, at 2–3; 49, at

4).  Around the same time, Lieutenant Steenblock and Major Wilson allowed plaintiff's isolation to continue.  (Docs. 42-2, at 17; 49, at 30).  A reasonable juror could connect Major Wilson's failure to act when faced with plaintiff's harassment to evidence supporting that he harassed plaintiff by ordering three deputies to write complaints about him for minor violations in November 2019.  (Docs. 42-1, at 18–19; 49, at 27–28).

The undisputed facts also show that plaintiff was regularly ridiculed and ostracized because of his FMLA use.  In each instance, these incidents intentionally undermined plaintiff's identity as a member of the Sheriff Department's team.  For instance, beginning in spring 2018, plaintiff, who until recently was friendly with other deputies, was told his FMLA use was "a dick move" and that he was "fucking [his fellow deputies] over" for using the leave.  (Docs. 42-2, at 1; 49, at 2).  Around this time, deputies formed a known isolation agreement to shun plaintiff, even though deputies' safety in the jail is dependent on their teamwork.  (Docs. 42-2, at 2, 17-18; 49, at 3–4, 31).  Lieutenant Steenblock knew about plaintiff's situation and forwarded an email from plaintiff to Major Wilson, but neither supervisor acted to stop the harassment.  (Docs. 42-2, at 17; 49, at 30).  In fall 2018, when plaintiff returned from FMLA leave, a deputy told plaintiff that he was not allowed to talk to him, and another deputy gave plaintiff the derisive nickname "FMLA."  (Docs. 42-2, at 3-4; 49, at 4–6).  The same type of treatment persisted into 2019, when deputies termed plaintiff a "blue falcon," identifying him as a person who "will screw over his friends for his own benefit," and put blue falcon stickers on his locker.  (Docs. 42-4, at 4; 49, at 6).  In April and May 2019, deputies continued to call plaintiff a "piece of shit" and expressed to him that he would not be considered for a position because plaintiff had taken FMLA.  (Docs. 42-2, at 4; 49, at 6–7).  Viewed collectively, these incidents support a finding that plaintiff's harassment was a continuing violation, not a series of discrete occurrences.

Other factors weigh in favor of finding a continuing violation as well. As the Court elaborates below, the incidents were repeated and never dissipated, and similarly severe. Finally, assuming a jury finds these experiences are indeed harassment, a jury could also reasonably conclude that they were borne of the same gender animus. Plaintiff, a male deputy sheriff, endured these incidents but female deputy sheriffs who took FMLA leave for their children's births suffered no such treatment. (Docs. 42-2, at 6; 49, at 10).

Thus, for purposes of summary judgment, the Court finds that the undisputed facts show a continuing violation. Thus, when evaluating plaintiff's harassment claim, the Court may consider incidents outside ICRA's 300-day statute of limitations that are similar in nature, severity, and motivation to the harassing incidents within the 300-day statutory limitation.

### b. *Defendants' Substantive Arguments*

Because the Court finds that the statute of limitations does not exclude earlier acts, the Court will consider acts before October 24, 2018, when assessing the parties' arguments.

The Court turns to defendants' other arguments. Defendants assert that plaintiff cannot show that (1) plaintiff's harassment was severe or pervasive as to alter a term, condition, or privilege of employment, (2) defendants knew or should have known about the harassment, and (3) defendants acted negligently in creating, contributing to, or failing to stop the harassment. (Doc. 34-1, at 23–27). The Court finds that defendants do not fully discharge their initial burden of production to show that plaintiff cannot assert his claim successfully.

### i. *Severe or Pervasive*

First, defendants argue that the evidence does not show severe or pervasive harassment, but only shows a "large number of relatively minor instances of alleged

harassment." (Doc. 34-1, at 24) (citing *Dindinger v. Allsteel, Inc.*, No. 3:11-cv-00126-SMR-CFB, 2013 WL 11727240, at \*14–16 (S.D. Iowa Nov. 22, 2013)). Defendants construe plaintiff's experiences as receiving "inappropriate occasional remarks" and being shunned, which defendants assert has routinely been rejected as sufficiently severe to constitute a hostile work environment. *Id.*, at 25 (citing *Burkett v. Glickman*, 327 F.3d 658, 662 (8th Cir. 2003) (discussing "[o]ffhand comments and isolated incidents of offensive conduct")).

The cases defendants cite are readily distinguishable from the undisputed facts here. *See Dindinger*, 2013 WL 11727240, at \*2–8 (demanding employer); *Remmick*, 2017 WL4317291, at \*10 (harassment did not interfere with work duties); *Burkett v. Glickman*, 327 F.3d 658, 662 (8th Cir. 2003) (no evidence plaintiff was present for harassing remarks or when they might have occurred); *Duncan v. General Motors Corp.*, 300 F.3d 928, at 935 (8th Cir. 2002) (offending behavior rarely occurred and when it did it was objectively unoffensive).

To meet the severe or pervasive standard necessary to prove that harassment affects a term, condition or privilege of employment, a plaintiff "must show that the workplace is permeated with discriminatory intimidation, ridicule and insult." *Scusa v. Nestle U.S.A. Co., Inc.*, 181 F.3d 958, 966 (1999). The standard is assessed on the totality of the circumstances. *McElroy v. State*, 637 N.W.2d 488, 500 (Iowa 2001). Here, defendants do not show that no reasonable jury could find that plaintiff's harassment was not severe or pervasive, and thus that it did not affect a condition of his employment, based on the undisputed facts. Stated in the converse, the undisputed facts show that a reasonable jury could find plaintiff suffered discriminatory intimidation, ridicule and insult that affected his work performance and ultimately prevented him from working.

As a preliminary matter, many gender-based or sex-based harassment cases allege opposite-sex harassment, typically involving "explicit or implicit proposals of sexual activity." *McCown v. St. John's Health System*, 349 F.3d 540, 543 (8th Cir. 2003). *See generally, e.g.*, *Burlington*, 524 U.S. 742. Because plaintiff's claim is for same-sex harassment, his evidence looks different. His case is not severe in the sense that he was sexually assaulted, exposed, objectified, or threatened with sexual acts based on his gender.

Under this record, plaintiff and his harassing coworkers were men.[11] Plaintiff, a man, was allegedly harassed by coworkers, mostly or exclusively men, because he took FMLA leave when his child was born, even though these coworkers admitted they did not and would not harass a woman for taking FMLA leave. (Docs. 42-2, at 6; 49, at 10). Other harassment also related to plaintiff's gender. For instance, deputies graphically described incestuous homosexuality, and then asked for his insight, implying that plaintiff was homosexual for the effect of comedy or cruelty. (Docs. 42-2, at 12; 49, at 20). As the facts above detail, the evidence could support a finding that plaintiff was isolated, berated, and humiliated to the point of being ostracized for over a year and a half.

Further, some coworkers have stated that plaintiff was treated unfairly because he took FMLA leave. (Docs. 42-2, at 9; 49, at 14–15). The extensive undisputed facts above detail plaintiff's work environment following his application for and use of FMLA leave—from coworkers vandalizing plaintiff's locker, leaving the table whenever he sat down, tripping plaintiff and calling him "a piece of shit" to coworkers branding him a "buddy fucker" and marking his property with blue falcon stickers, nicknaming him "FMLA," and making a pact to isolate plaintiff, which plaintiff asserts continued for at

---

[11] To be sure, some of plaintiff's coworkers are women. But no harassing coworkers appear to be women.

least a year and a half. (Doc. 42-1, at 16). In sum, the examples of plaintiff's harassment are extensive and occurred with some frequency for the better part of 2018 through 2019. Thus, a reasonable jury could interpret them collectively as severe, based on the seriousness of the conduct, or pervasive, based on the frequency of the conduct.

In turn, a reasonable jury could also find that the harassment affected a term, condition, or privilege of plaintiff's employment. The undisputed facts show plaintiff's work environment caused him to develop an anxiety disorder and to have at least one panic attack. (Docs. 42-2, at 19–20; 49, at 34–35). The undisputed facts also show this harassment interfered with his work performance because deputies constantly rely on each other, especially considering the inherent dangers of working with inmates, but plaintiff could not trust his fellow deputies anymore. (Docs. 42-2, at 15, 17–18; 49, at 26–27, 31). The "blue falcon" moniker is particularly indicative of this because it indicates that plaintiff's coworkers had branded plaintiff as an "other," and someone not to be trusted. (Docs. 42-4, at 4; 49, at 6). Most important, the undisputed facts support that the harassing conduct, and defendants' failure to stop it, caused plaintiff to take medical leave and ultimately to lose his job. (Docs. 33-1, at 9; 42-1, at 19). Thus, a jury could find that this harassment ultimately caused plaintiff's anxiety disorder and prevented plaintiff from working.

Thus, a reasonable jury could find that these later incidents show that the same harassment, temporarily dormant, continued for the same reasons—plaintiff's use of FMLA leave—and affected a term, condition, or privilege of his employment.

### ii.    *Defendants' Response to Harassment*

Defendants also fail to show that plaintiff cannot establish that defendants (1) "knew or should have known about the harassment" and (2) "failed to take prompt and appropriate remedial action." *Haskenhoff*, 897 N.W.2d at 575. First, defendants argue that they learned about the complaint when plaintiff filed

his complaint with human resources on June 26, 2019. (Docs. 33-1, at 4; 42-1, at 8). But plaintiff complained to Lieutenant Steenblock and Major Wilson well before he complained to human resources. (Docs. 33-1, at 2, 4; 42-1, at 2–3, 7). Given the paramilitary structure of the Sheriff's Department and its strict chain of command, a reasonable jury could find that defendants knew or should have known of plaintiff's harassment because plaintiff informed his supervisors. Second, defendants argue they took prompt and appropriate remedial action because they hired an outside investigator who conducted a thorough investigation, issued discipline, issued pertinent directives, and provided training to all employees. (Doc. 34-1, at 26–27). But as the Court has already discussed, a reasonable jury could differ as to whether these measures were appropriate. Moreover, given the dispute about when plaintiff complained to defendants, a reasonable jury could differ as to whether they were prompt.

Thus, the Court finds that summary judgment is inappropriate on plaintiff's gender-based harassment claim.

### 3. *ICRA Retaliation for Complaining of Gender-Based Harassment*

To establish a prima facie case of retaliation, a plaintiff must "show that (1) he engaged in a protected activity; (2) the defendant took an adverse action against him; and (3) the adverse action is causally linked to the protected activity." *Scusa*, 181 F.3d at 968. These prima facie requirements mirror those in the *McDonnell Douglas* burden-shifting framework applied in Title VII cases. *See generally McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

An adverse action is "a tangible change in working conditions that produces a material employment disadvantage, including but not limited to, termination, cuts in pay or benefits, and changes that affect an employee's future career prospects, as well as circumstances amounting to a constructive discharge." *Martin v. Champion Ford, Inc.*, 41 F. Supp. 3d 747, 761 (N.D. Iowa 2014). "Minor changes in duties or working

conditions, even unpalatable or unwelcome ones, which cause no materially significant disadvantage, are not adverse employment actions." *Id.* The court may, however, consider the cumulative of "[l]esser actions" if the employee "suffer[s] serious employment consequences that adversely affect or undermine [his] position." *Wagner v. Campbell*, 779 F.3d 761, 767 (8th Cir. 2015).

In an ICRA retaliation claim, the causation standard is whether the employee's engagement in the protected activity was "a motivating factor" in the employer's decision to take adverse action against him. *Hawkins v. Grinnell Reg'l Med'l Ctr.*, 929 N.W.2d 261, 272 (Iowa 2019). *Contra University of Texas Southwestern Med'l Ctr.*, 570 U.S. 338, 363 (2013) (holding that Title VII retaliation has a "more demanding" but-for standard). The motivating-factor standard "demands a sensitive inquiry into such circumstantial and direct evidence as may be available." *Mensie v. City of Little Rock*, 917 F.3d 685, 689 (8th Cir. 2019).

Again tracing the *McDonnell Douglas* framework, if a plaintiff establishes a prima facie case of retaliation, then the defendant must "articulate a legitimate, nonretaliatory reason for the action." *Hulme v. Barrett*, 449 N.W.2d 629, 633 (Iowa 1989). In response, a plaintiff can show that the employer's stated reason was pretextual by showing that the employer was more lenient with other, similarly situated employees who were not part of a protected class or did not engage in protected activity. *Salitros v. Chrysler Corp.*, 306 F.3d 562, 570 (8th Cir. 2002). When a plaintiff shows pretext, the question of whether retaliation occurred is a question for the jury. *DeBoom*, 772 N.W.2d at 10.

Defendants argue that plaintiff cannot establish a prima facie case because he does not show that his complaint was a motivating factor in defendants' decision to fire him. (Doc. 34-1, at 27–29). Instead, defendants argue, the evidence shows defendants responded appropriately and thoroughly to plaintiff's complaint to human resources and that plaintiff was the one who "elected to go on leave." (*Id.*, at 28). In the alternative,

defendants argue that even if the Court finds that plaintiff did establish a prima facie case, defendants had a legitimate, nonretaliatory reason to terminate plaintiff's employment. (*Id.*, at 28–29).

Plaintiff argues that he has shown his complaint was a motivating factor because the evidence shows an "unbroken chain of events" between his harassment, his complaint, his discipline, and his ultimate termination. (Docs. 41-1, at 21–22; 54, at 5–7). Plaintiff argues that the record shows that employees retaliated openly against plaintiff for his complaint and defendants rushed to discipline plaintiff. (Docs. 41-1, at 21–22; 54, at 5–7).

Here, as a preliminary matter, the Court identifies the protected activity and the challenged adverse actions. The protected activity is plaintiff's complaint. Plaintiff's arguments, supported by the undisputed facts, identify several potential adverse actions: the three complaints that Major Wilson ordered filed on November 18, 2019; Sheriff Gardner's effectuation of consequences, if not discipline, based on those complaints; the consequences themselves—i.e., the counselling recommendation and the recommended meeting with Sheriff Gardner; and plaintiff's termination. (Docs. 41-1, at 16, 22; 51, at 10–11). In response, defendants seem to argue that the challenged actions were not "adverse actions." (Doc. 51, at 10–12). Plaintiff's termination is undoubtedly an adverse employment action. *Martin*, 41 F. Supp. 3d at 761. Major Wilson's complaints, Sheriff Gardner's effectuation, and consequences imposed are individually possible adverse actions because they could affect plaintiff's future career prospects. *Id.* More importantly, the cumulative effect of the complaints, their effectuation, and the consequences imposed caused plaintiff to suffer serious employment consequences—that is, without these actions, plaintiff would not have lost his job. *Id.*; *Wagner*, 779 F.3d at 767. Thus, the Court will consider each individual adverse action that plaintiff discusses.

34

Regardless of which action is the adverse action, the core issue in the parties' dispute is whether the adverse action was *caused* by the protected activity. Thus, the Court will consider whether each labeled adverse action was caused by the protected activity—plaintiff's complaint.

For the following reasons, defendants fail to meet their initial burden of showing that no genuine issue exists for trial and thus defendants' motion for summary judgment on plaintiff's ICRA claim must be denied.

### a.    *Motivating Factor*

Defendants have not met their initial burden regarding the causality element of plaintiff's claim. Generally, the fact-intensive motivating factor inquiry for causation weighs in favor of interpreting this as a jury question. *See Mensie*, 917 F.3d at 689. The Court will consider each adverse action in turn.

A reasonable jury could find that Major Wilson, a supervisor in charge of the jail, retaliated against plaintiff for complaining about his harassment when he gave orders to deputies to write up these complaints. (Docs. 42-1, at 18–19; 49, at 27–28). A reasonable jury could find the timing supports a finding of retaliatory motive. After plaintiff's complaint, Duckett investigated plaintiff's work environment and released his report, causing Sheriff Gardner to institute related discipline and implement a new department policy. (*See* Docs. 33-1, at 7–8; 42-1, at 15). In addition, Sherriff Gardner reduced Major Wilson's leave. (*See* Docs. 44-2, at 15; 49, at 26). Less than two months later, Major Wilson ordered that three complaints be filed against plaintiff. (*See* Docs. 33-1, at 7–8; 42-1, at 15).

A jury could also find that Sheriff Gardner effectuated this retaliation by disciplining plaintiff, (Doc. 51, at 10; 42-2, at 16; 49, at 29), as defendants state only he can. (Doc. 34-1, at 22). Even though defendants argue that plaintiff did not actually receive discipline because he merely received a recommendation to talk with the Sheriff

and was recommended for counseling, (Doc. 51, at 10; 42-2, at 16; 49, at 29), a reasonable jury could interpret counseling and a recommended discussion as retaliatory discipline or something less than discipline that was nevertheless retaliatory.

Other undisputed incidents also support a finding that defendants retaliated against plaintiff. A reasonable jury could find that Sheriff Gardner retaliated against plaintiff when he imposed verbal counseling on him for "peter-tapping," because others engaged in this behavior regularly and plaintiff did not remember doing it. (Docs. 41-2, at 14;49, at 24).

And, a reasonable jury could find that plaintiff's termination was caused by plaintiff's initial complaint. Plaintiff argues his termination was retaliatory because he did not "refuse" to return to work; instead, he *could not* return to work because of the anxiety his harassment caused. (Docs. 41-1, at 22–23; 54, at 6–7). Thus, plaintiff argues, he was effectively fired because he was harassed. (Docs. 41-1, at 22–23; 54, at 6–7). After plaintiff's complaint, Major Wilson ordered three complaints, and Sheriff Gardner issued discipline, whether it was "true discipline" or not, when he did not do so for deputies who behaved similarly. (Docs. 33-1, at 9; 42-1, at 19). The evidence could support a conclusion that these adverse actions in turn caused plaintiff to leave the workplace and stay on leave until he was fired. (Docs. 33-1, at 12; 42-1, at 27). A reasonable jury could find that this chain of events shows not only that retaliation was a motivating factor in defendants' decision to fire plaintiff, but-for plaintiff's complaint, a jury could find, defendants would not have fired plaintiff.

### b.    *Legitimate Nondiscriminatory Reason*

Having found that a reasonable jury could find that plaintiff established a prima facie case of retaliation, the burden shifts to defendants to show a nondiscriminatory reason for taking the adverse actions.

Defendants do not, however, assert a legitimate nondiscriminatory reason for Major Wilson's complaints, Sheriff Gardner's effectuation of consequences, or the consequences imposed. (*See* Docs. 36, at 27–29; 51, 10–11).[12] Thus, defendants do not meet their initial burden regarding these adverse actions and the Court need not consider pretext. Because plaintiff's prima facie case stands, defendants' motion for summary judgment based on these adverse actions cannot succeed.

Defendants also do not assert a legitimate nondiscriminatory reason for firing plaintiff. Essentially, defendants claim they fired plaintiff because he refused to avail himself of either of the options presented to him. (Doc. 34-1, at 29). Plaintiff did not "provide documentation from a medical provider" or "return to the workplace." (*Id.*). Although this appears on its face to be a legitimate nondiscriminatory reason, the circumstances preclude such a finding on summary judgment. There is no dispute as to whether defendants could fire plaintiff based on the options that they had presented to him. Indeed, plaintiff neither provided documentation from a medical provider nor

---

[12] Defendants' arguments focus on plaintiff's termination as the adverse action. (Doc. 51, at 10–12). Addressing other potential adverse actions, defendants first argue that plaintiff received only a counseling session for his "blow" comments based on the Duckett investigation. In addition, defendants argue that plaintiff was not disciplined for his comments about Deputy Walton's wife, but rather was recommended to meet with Sheriff Gardner, but did not do so because he went on medical leave. (*Id.*). Defendants do not address other adverse actions supported by the record, discussed by the Court below.

  Plaintiff appears to have been the subject of a complaint about using the word "blow" in this context at least twice. In their reply, defendants state the "blow" complaint is not evidence of plaintiff being treated differently from other deputies because he was given a counseling session for this conduct after the Duckett investigation, in which many people received counseling or a form of formal discipline. (*See* Doc. 51, at 10). Defendants' supporting citation, however, reveals this argument refers to the complaint written on October 29, 2019. (*Id.* (citing Def. App'x 226–27)).

  The record, however, shows that another complaint was written on November 18, 2019, about the same or similar behavior. Because this complaint was outside the context of the Duckett report's resulting discipline, the Court finds that the November 18, 2019 "blow" complaint would be the most relevant to a jury's analysis.

returned to the workplace. (Docs. 33-1, at 12; 42-1, at 27). But it is debatable whether plaintiff actually refused to return to work. Plaintiff left for medical reasons—namely, the anxiety caused by his harassing work environment. (Docs. 42-2, at 19–20; 49, at 34–35). A reasonable jury could find that plaintiff *could not* return to work. Moreover, plaintiff told defendants this was the reason why he was not returning. (Docs. 33-1, at 11; 42-1, at 24–25) (plaintiff told defendants he could not return to work because it would place him "back in with [his] harassers"). Thus, a reasonable jury could find that defendants knew this and therefore the legitimate nondiscriminatory reason they assert was actually discriminatory. Because a genuine dispute exists as to whether defendants' adverse action of firing plaintiff had a legitimate nondiscriminatory reason, the Court need not reach whether defendants' purported legitimate nondiscriminatory reason was pretextual.

In sum, defendants have not shown that no genuine issue exists on the undisputed facts about whether defendants retaliated against plaintiff when defendants took any of the labeled "adverse actions." Because defendants have not met their initial burden, the Court denies defendants' request for summary judgment on plaintiff's ICRA retaliation claim.

### 4. *FMLA Discrimination and Retaliation*

Under the FMLA, it is unlawful for an employer to "interfere with, restrain, or deny the exercise of or the attempt to exercise" certain enumerated rights. 29 U.S.C. § 2615. If employers do any of the above, they are "liable to [the] eligible employee" for, in relevant part, damages equal to wages, salary, benefits, or other compensation caused by the violation, or actual monetary losses caused by the violation. 29 U.S.C.A. § 2617 (a)(1)(A)(i).

The Eighth Circuit Court of Appeals recognizes three types of FMLA claims: entitlement,[13] discrimination, and retaliation. At issue here are discrimination and retaliation claims. Retaliation claims arise when (1) an employee opposes an action that the FMLA makes unlawful, and (2) the employer reacts by taking an adverse action against that employee. *Pulczinski v. Trinity Structural Tower, Inc.*, 691 F.3d 996, 1005–06 (8th Cir. 2012). For instance, retaliation occurs when the employee complains about his employer's noncompliance with the FMLA, and the employer responds by firing him. When the employee alleges termination because of FMLA leave, the employee must show evidence that justifies an inference of retaliatory motive. *Beckley v. St. Luke's Episcopal-Presbyterian Hosps.*, 923 F.3d 1157, 1160 (8th Cir. 2019). Discrimination claims arise when (1) "the employee exercised his statutory rights" and (2) "the employer discriminated against him in the terms and conditions of employment." *Pulcinzski*, 691 F.3d at 1006. Finally, an employee can show retaliation or discrimination either by direct evidence or circumstantial evidence. *See Beckley*, 923 F.3d at 1160 (retaliation); *Hasenwinkel v. Mosaic*, 809 F.3d 427, 433 (8th Cir. 2015) (discrimination). But in all cases, plaintiff must also allege prejudice from the asserted FMLA violation. The FMLA "provides no relief unless the employee has been prejudiced by the violation." *Ragsdale v. Wolverine World Wide, Inc.,* 535 U.S. 81, 89 (2002); *Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1006 (8th Cir. 2012).

When the employee's evidence is circumstantial, the Eighth Circuit uses the *McDonnell Douglas* burden-shifting framework. *Beckley*, 923 F.3d at 1160; *see generally McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). To show a prima facie case of FMLA discrimination, an employee must show that (1) the engaged in activity is protected under the FMLA, (2) he suffered a materially adverse employment

---

[13] Because plaintiff does not allege an entitlement claim, also known as an interference claim, the Court does not analyze its requirements further.

action, and (3) a causal connection existed between the employee's action and the adverse employment action. *See Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 999 (8th Cir. 2011); *Pulczinski*, 691 F.3d at 1007. "[A m]aterially adverse action is action that would deter a reasonable employee from making a charge of employment discrimination." *Id.* (adopting deterrence standard when analyzing discrimination claim)[14] (quoting *Fercello v. County of Ramsey,* 612 F.3d 1069, 1077–78 (8th Cir. 2010) (same in retaliation context)).[15] A prima facie case of retaliation requires the same elements, except the adverse action need only be adverse. *See Barker v. Missouri Dept. of Corrections*, 513 F.3d 831, 835 (8th Cir. 2008). "Termination is unequivocally an adverse employment action,"[16] but only if the employee was terminated because he used FMLA leave. *Hasenwinkel*, 809 F.3d at 433 (internal quotation marks omitted). In an FMLA claim, the causation standard is whether the employee's exercise of FMLA rights "*played a part*

---

[14] *Wierman v. Casey's Gen. Stores* distinguishes between retaliation claims, which it describes as "claims where the employee alleges that the employer discriminated against her for exercising her FMLA rights," and "interference claims" as the claims available under the FMLA. 638 F.3d 984, 999 (8th Cir. 2011) (internal quotation marks omitted). As the Court describes above, this description collapses two technically separate claims—discrimination and retaliation. In *Wierman*, the plaintiff alleged discrimination. *See id.* at 1000 (plaintiff used FMLA leave and defendant "terminated her within a week, in part due to absences that may have been covered by FMLA"). *See also Pulczinski*, 691 F.3d at 1005–06.

[15] *Fercello v. County of Ramsey* analyzes a retaliation claim "under Title VII and the Minnesota Human Rights Act alleging that the [defendant] had retaliated against [the plaintiff] for reporting . . . sexual harassment." 612 F.3d 1069, 1077 (8th Cir. 2010). In the context of FMLA, this would be a retaliation claim. *See also Pulczinski*, 691 F.3d at 1005–06.

[16] Certainly, there can be no more adverse employment action than termination. But, nevertheless, the *Hasenwinkel* Court does not identify it as "materially adverse." The Court notes that the term "materially adverse" may indeed be a natural evolution of the term "adverse," retaining its original meaning and instead clarifying that "[d]isrespect, ostracization, loss of status and prestige, and change of duties or working conditions are not [substantial enough to be] adverse employment actions." *Devitt v. Potter*, 234 F. Supp. 2d 1034, 1040 (D.N.D. 2002).

Case 1:20-cv-00023-CJW-MAR   Document 56   Filed 12/01/21   Page 40 of 49

in the employer's decision." *Pulcinzski*, 691 F.3d at 1007 (internal quotations omitted) (emphasis added).

Regardless of the type of claim, damages are always limited to monetary damages, including the plaintiff's lost wages, interest, and liquidated damages. 29 U.S.C. § 2617. Lost wages for medical leave may include compensation for leave "made necessary by the physically and psychologically damaging harassment experienced at the worksite." *Salitros v. Chrysler Corp.*, 306 F.3d 562, 573–74 (8th Cir. 2002) (internal quotation marks omitted).

If plaintiff makes a prima facie case, then the burden shifts to the employer to shows a legitimate, nondiscriminatory reason for its action. *See id.* at 1002. Finally, if the employer shows such a reason, the plaintiff must present sufficient evidence that this reason was pretext for discrimination. *See id.*

Here, plaintiff asserts that defendants discriminated and retaliated against him for taking FMLA leave. Defendants argue that plaintiff's FMLA claims fail as a matter of law. First, defendants argue that plaintiff did not allege that defendants took any discrete adverse employment action against him. (Doc. 34-1, at 19). Second, defendants argue that plaintiff cannot show monetary damages because his answers to defendants' interrogatories "specifically attribute his lost wages and benefits to the County's alleged failure to accommodate his disability" and plaintiff's supplemental answers to interrogatories attempted to "manufacture the monetary damages required." (Docs. 34-1, at 18–19; 51, at 7–8). Third, relying on their argument on the ICRA harassment claim, defendants argue that even if plaintiff's FMLA harassment claim could continue, plaintiff would fail because the harassment was not severe or pervasive. (Doc. 34-1, at 20). Finally, renewing their ICRA retaliation arguments, defendants argue that plaintiff cannot show a causal connection between plaintiff's FMLA use and defendants' firing

41

him and therefore he cannot show a prima facie case of discrimination or retaliation, or show pretext in either.  (*Id.*, at 8–10).

Plaintiff argues the evidence supports a finding in his favor.  First, plaintiff argues that he has alleged termination as an adverse employment action and that his harassment is also an adverse employment action because it would dissuade a reasonable worker in plaintiff's position from exercising his legal rights.  (Doc. 41-1, at 14, 18–19).  Second, plaintiff argues he has shown monetary damages in the form of lost wages and benefits, including the paid sick leave, holiday/vacation leave, and unpaid sick leave he used between November 19, 2020, and April 27, 2021.  (*Id.*, at 19–20).  Plaintiff argues he is also entitled to the wages he has lost since being fired.  (*Id.*, at 20).  Plaintiff argues that his second amended complaint (Doc. 28) and supplemental answers to interrogatories support his claim for monetary damages, (Doc. 54, at 2–3), and that his initial representations differ from his amended and supplemented filings because he did not have a disability claim when he first answered discovery.  (*Id.* (citing FED. R. CIV. P. 56))).  Third, plaintiff argues that harassment rising to the level of discrimination is a recognized cause-of-action under the FMLA.  (*Id.*, at 14–17 (citing *Hite v. Vermeer Mfg. Co.*, 446 F.3d 858, 869 (8th Cir. 2006)).  Fourth, plaintiff asserts that severe or pervasive is not the standard for an FMLA claim.  (*Id.*, at 17–18).  Instead, plaintiff argues, courts have incorporated the Supreme Court's "deterrence" standard stemming from *Burlington Northern & Santa Fe. Ry. Co. v. White*, 548 U.S. 53, 59 (2006).  (*Id.*).  Finally, plaintiff argues that to prove causation, he need only show that harassment "culminated in his termination," not that defendants intentionally relied on plaintiff's protected status or activity when deciding to fire him.  (Doc. 54, at 4).

The Court finds that defendants fail to discharge their initial burden to show affirmative evidence that plaintiff was not entitled to legal relief on plaintiff's retaliation claim.  A reasonable jury, however, could not find in favor of plaintiff's discrimination

claim based on harassment. Thus, summary judgment on plaintiff's FMLA claims is granted in part and denied in part.

Before reaching the parties' substantial disputes, the Court addresses two initial matters. First, the Court finds that despite defendants' argument, plaintiff alleges that defendants took a discrete adverse employment action against him. Specifically, plaintiff alleged that defendants caused his termination through discrimination and retaliation. (Doc. 28, 8–10, 12–13). Termination is an adverse employment action. *Hasenwinkel*, 809 F.3d at 433. Second, Eighth Circuit precedent adopts *Burlington Northern*'s "deterrence" standard in favor of the "severe or pervasive standard" in assessing FMLA claims. *Wierman*, 638 F.3d at 999. Thus, the Court will assess the evidence using the deterrence standard.

Still, before assessing whether a reasonable jury could find in favor of plaintiff, the Court must first determine whether the evidence shows that plaintiff suffered prejudice from any asserted FMLA violation. The FMLA "provides no relief unless the employee has been prejudiced by the violation." *Ragsdale,* 535 U.S. at 89; *Pulczinski*, 691 F.3d at 1006. Specifically, the Court must resolve whether plaintiff alleged prejudice in the form of lost wages, interest, and liquidated damages.

### a. *Monetary Damages*

As a threshold issue, defendants assert that the Court cannot consider plaintiff's reasoning because plaintiff alleged lost wages and benefits only in relation to his failure to accommodate claim, not his FMLA claims, and any effort to assert them since has been an attempt to "manufacture" the damages necessary to sustain plaintiff's other claims. (Doc. 51, at 7–8). Plaintiff asserts that Rule 56 allows such revisions. (Doc. 54, at 2–3). Because resolution of this issue is rooted in what Rule 56 does and does not allow, the Court turns to it first.

Rule 56 requires that "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, *interrogatory answers*, or other materials" be cited by "[a] party asserting that a fact cannot be or is genuinely disputed." FED. R. CIV. P. 56 (emphasis added). According to Rule 26, parties "must supplement" initial interrogatory answers if the change is material:

> (1) *In General.* A party . . . who has responded to an interrogatory . . . *must supplement or correct* its disclosure or response:
>> (A) in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing; or
>> (B) as ordered by the court."

FED. R. CIV. P. 26(e)(1) (emphasis added).

The Court finds that plaintiff's supplemental interrogatory answers, based on his Amended Second Complaint, were required by Rule 26. Accordingly, they do not "manufacture" evidence, as defendants assert, and can be properly considered under Rule 56. Thus, plaintiff's FMLA claims survive the threshold issue of whether he has asserted the requisite monetary damages and the jury may consider the monetary damages that plaintiff asserts.

Having concluded that plaintiff has asserted monetary damages under Rule 56, the Court turns to assessing how a reasonable jury could interpret plaintiff's FMLA claims.

### b.      *FMLA Discrimination Based on Harassment*

The parties dispute whether the Eighth Circuit has recognized harassment as a subset of the FMLA's discrimination claim. The Eighth Circuit's precedent on discrimination and retaliation claims often conflates the two terms or collapses them into a single type of claim. *See Pulczinski*, 691 F.3d at 1005–06; *Brandes v. City of Waterloo*,

No. 18-CV-2089-KEM, 2020 WL 42109055, at *9 (N.D. Iowa July 22, 2020). Before *Pulczinski*, the Eighth Circuit often referred to discrimination claims as "retaliation" claims. *See, e.g.*, *Wierman*, 638 F.3d at 999; *Hite*, 446 F.3d at 869. Thus, in the Eighth Circuit, at least prior to 2012, "discrimination" and "retaliation" under the FMLA sometimes represent the same type of claim.

Regardless of the type of claim, the Eighth Circuit Court of Appeals has recognized that an FMLA claim may succeed based on evidence of harassing behavior. *See generally Hite*, 446 F.3d 858 (recognizing an FMLA discrimination claim based on harassment).[17] Defendants are correct that the *Hite* Court "did not hold that harassment is a viable stand-alone claim under the FMLA." (Doc. 51, at 8). The *Hite* Court did, however, find a viable FMLA discrimination claim where the evidence showed an employee was continually harassed about using FMLA leave. *Hite*, 446 F.3d at 869.

Defendants' argument that the Eighth Circuit does not recognize harassment claims under the FMLA (Doc. 34-1, at 19–20) also misreads their cited precedent of *Hernandez v. Bridgestone Americas Tire Operations, LLC*. 97 F. Supp. 3d 1062 (S.D. Iowa 2014). The *Hernandez* Court held otherwise. *Id.* at 1076–77. In keeping with *Hite*, the *Hernandez* Court found that harassment was not a *separate type* of claim under the Eighth Circuit's precedent, but that a plaintiff could show an FMLA claim based on harassment where the harassment was "sufficiently severe" that the plaintiff was "constructively

---

[17] The *Hite* Court wrote that "[t]he jury was presented with evidence that Leedom harassed Hite about using FMLA leave on a continual basis, and that when Hite complained to her superiors, Leedom's harassment did not cease." *Id.*, at 869. Though *Hite* discusses the plaintiff's claim as a retaliation claim, it was actually a discrimination claim under the *Pulczinski* analysis. *See* 691 F.3d at 1005–06. This is because the plaintiff exercised her rights and was discriminated against in the terms and conditions of her employment. *See id.*; *Hite*, 446 F.3d at 864–65. She did not oppose an action that the FMLA makes unlawful. *See Pulczinski*, 691 F.3d at 1006–06.

discharged." *Id.* In *Hernandez*, the Court found that the plaintiff could not present any type of viable FLMA claim because he did not suffer actual monetary damages. *Id.*

Although the Eighth Circuit recognizes harassment as a foundation for discrimination based on FMLA use, it does so sparingly. The comparison between the Eighth Circuit's *Hite* and *Ebersole v. Novo Nordisk, Inc.*[18] cases is instructive. In both cases, the plaintiffs alleged "their employers (1) targeted and harassed them following their FMLA leave, (2) threatened that additional leave would result in termination, (3) ultimately terminated them for taking leave, and (4) claimed that termination resulted from a violation of company policy despite their direct supervisors' approval." *Ebersole*, 758 F.3d 917, 927 (8th Cir. 2014).

The Court found that the plaintiff's evidence supported a finding of harassment in *Hite* but not in *Ebersole*. The facts in *Hite* were objectively more severe and threatening than those in *Ebersole*. In *Hite*, the plaintiff's supervisor (1) "explicitly told her that she did not look sick and that she needed to be at work," (2) "regularly complained that FMLA was bad for the company and about Hite's use of FMLA leave, (3) "punished her for taking FMLA leave by transferring Hite to more difficult labor following her FMLA leave," (4) "explicitly threatened Hite that he would transfer her permanently to more difficult tasks if she continued to take FMLA leave," (5) "threatened to terminate her if she took more FMLA leave," and (7) "regularly disciplined her for violating minor company policies despite his lack of discipline for the same offenses committed by other similarly situated employees." *Id.* (citing *Hite*, 443 F.3d at 861–62). None of this

---

[18] *Ebersole* discusses the claim as one of retaliation. 758 F.3d 917, 923 (8th Cir. 2014). Unfortunately for clarity's sake, the Eighth Circuit did not incorporate its *Pulczinski* precedent in its opinion. *See id.* ("We recognize two types of claims under the FMLA: interference and retaliation claims."). *Contra Pulczinski*, 691 F.3d 1005–1006 (listing three types of FMLA claims: entitlement, discrimination, and retaliation). The claim in *Ebersole* is a discrimination claim because the plaintiff alleges that the defendant's actions occurred after the plaintiff exercised her statutory rights, versus opposed an action that the FMLA makes unlawful. *Id.*

behavior happened in *Ebersole*. The *Ebersole* Court found that the plaintiff's evidence of harassment did not support a finding of FMLA discrimination. *Ebersole*, 756 F.3d at 927.

Here, the undisputed facts do not rise to the level of harassment found in *Hite*, which appears unequaled by any subsequent Eighth Circuit decision. But they well surpass the level of harassment in *Ebersole*. Plaintiff need only show that his harassment was a materially adverse action that would deter a reasonable employee from bringing a charge against his employer. *Wierman*, 638 F.3d at 999. As described above, the evidence supports a finding that plaintiff was disciplined on multiple occasions when similarly situated employees were not or other employees received substantially less discipline than plaintiff proportional to recommendations, following the Duckett report. (*See, e.g.*, Docs. 31-1, at 6; 42-1, at 12; 42-2, at 15; 49, at 26–28). Defendants, however, never expressly told plaintiff that he did not need to take FMLA leave, that FMLA was bad for the department, transferred him to more difficult tasks, or threatened to make those transfers permanent.

Still, a reasonable jury could find that plaintiff's experiences, which caused anxiety leading to plaintiff's leave, would deter a reasonable employee from bringing a charge against his employer. A reasonable jury could also find that defendants discriminated against plaintiff for taking FMLA leave when defendants fired plaintiff for, in part, failing to produce a medical note with an approximate return date because defendants perpetuated plaintiff's harassment and effectively prevented plaintiff from obtaining such a note.

Thus, defendants have not shown that a reasonable jury could not find in favor of plaintiff's FMLA discrimination claim based on harassment based on the undisputed facts. The Court denies defendants' motion for summary judgment as to this claim.

### c. FMLA Retaliation

Next, the Court must decide whether the evidence shows a prima facie case of retaliation. Drawing on the same principles as their ICRA claim, defendants argue that plaintiff cannot meet either his initial burden or his secondary burden under *McDonnell Douglas*. First, defendants argue that the evidence does not show that his FMLA use caused the retaliation of which now he complains. (Doc. 51, at 8–10). Second, defendants argue that plaintiff cannot show that their nondiscriminatory reason—that they fired plaintiff because he did not abide by the terms of their letter—was pretextual. (*Id.*).

The Court has already found that the undisputed facts support a finding of an ICRA retaliation claim and a finding of pretext under the *McDonnell Douglas* framework. But the *McDonnell Douglas* framework under FMLA retaliation poses an additional question. Under the FMLA, as opposed to the ICRA, "an employee must prove that his exercise of FLMA rights "played a part in the employer's decision." *Pulcinzski*, 691 F.3d at 1007. In contrast, under the ICRA, the employee must show that his protected activity was "a motivating factor" in the employer's adverse decision. *Hawkins*, 929 N.W.2d 261, 271–72 (Iowa 2019) (applying "motivating factor standard" in "discrimination and retaliation cases under ICRA"). Courts have explained "motivating factor" as one that "played a part" in the employer's decision. *See DeBoom*, 772 N.W.2d at 12–13 (interpreting "played a part" as a motivating, not determining, factor); *Haskenhoff*, 897 N.W.2d at 582 (reiterating *DeBoom*'s holding).[19] Thus, the FMLA retaliation standard is comparable to the ICRA retaliation standard. Hence, the Court relies on its earlier analysis and finds that a reasonable jury could find that plaintiff's exercise of his FMLA rights played a part in the employer's decision.

---

[19] *DeBoom* and *Haskenhoff* are both in the context of discrimination, not retaliation. *See DeBoom*, 772 N.W.2d at 12–13; *Haskenhoff*, 897 N.W.2d at 582. But *Hawkins* made it clear that the motivating factor standard now applies to both ICRA discrimination and retaliation claims. 929 N.W.2d at 271–72.

48

Thus, for the reasons stated above regarding plaintiff's ICRA claim, the Court finds that the undisputed facts support a prima facie case of FMLA retaliation and a finding of pretext. Defendants have not shown that a reasonable jury could not find in favor of plaintiff's FMLA retaliation claim based on the undisputed facts.

For these reasons, the Court finds that defendants fail to meet their initial burden, and defendants' motion for summary judgment on plaintiff's FMLA discrimination based on harassment, and FMLA retaliation claims, is denied.

In sum, the Court **grants** defendants' motion for summary judgment on plaintiff's disability and sex discrimination claims, which plaintiff does not resist, and **grants** defendants' motion for summary judgment on plaintiff's failure-to-accommodate claim centered on reassignment. The Court otherwise **denies** defendants' motion for summary judgment.

## IV.    CONCLUSION

For these reasons, plaintiff's motion for partial summary judgment is **granted.** Defendants' motion for summary judgment is **granted in part** and **denied in part.**

**IT IS SO ORDERED** this 1st day of December, 2021.

_____
C.J. Williams
United States District Judge
Northern District of Iowa

49